Next case, Dribben v. Lurbo Land Trust, Davidson. Good morning, your honors. My name is Paul Madoff, and I'm counsel for Dr. William and Wendy Dribben. And we're here appealing the Circuit Court's order denying request for a stalking no contact order under a new stalking statute, 740 ILCS.1. Jurisdiction is proper in this court under Supreme Court Rule 307A.1 that's akin to an interlocutory appeal of the Denial of Culminary Injunction. This case, your honors, epitomizes why the legislature passed the no stalking law. I'm sorry? Go ahead. It says that debtors have a big bite to people. They have a bite between the two people. Yes. Okay. Go on. Yeah, that's right. It's to prevent people from escalating their behaviors that leads to fights or criminal acts or property destruction or what have you. But there's been a lengthy history of stalking laws and trying to revise the laws to come up with ways to counteract the arguments that defendants make in these kinds of situations. The law in this case was passed because a neighbor to – how do I want to say this? There's a small girl. The neighbor child was harassing the girl. There were no laws to prevent it. So she went to the legislature. They had a hearing. This was Exhibit QQQ that we put in the legislative history that addressed the fact that there's no way for neighbors to get orders to prevent stalking. And so the legislature looked at the revised model code for stalking and passed the act, which is basically modeled directly after it. And the reason I say that this case epitomizes why the act was passed is because all of the classic defenses that are raised by defendants under the prior stalking laws were raised and found to be valid in this case. And under the act, as properly passed by the legislature, all of those defenses are legally irrelevant. So the reason the driven should prevail in this matter, and the reason I'm asking your honors to reverse the honorable circuit court judge, is because the circuit court judge misapplied and misinterpreted the act. And if he had properly construed it and applied it to the admissions of the respondent, he should have issued a stalking no-contact order. The preamble to the stalking act says that the legislature's determined citizens have a right to be left alone. And the drivens, pretty much starting in 2002, four years before there was any litigation between the parties, started telling the Davidsons, we want to be left alone. The court, I think, glommed on the fact that there was litigation between the parties. And I think that he may have viewed that there were improper motives in bringing the stalking act and looking at, you know, the motives that he ascribed to whomever, he decided the viewers shouldn't issue it. That's all error on his part. The motives of the parties are irrelevant. The court allowed the respondent to put the petitioner and myself on trial instead of limiting the evidence to what's relevant under the act. Interestingly, the respondent's brief argues that the petitioner's, it says that the fact suggests that the petitioner's have more animus towards the respondent than the respondent does towards the petitioner. First of all, that's a concession that the respondent has animus towards the petitioner. But setting that aside, the whole point of the act is to symbolize these situations. This could have all been heard in one hearing in one setting. The orders of protection, you're not supposed to go to trial and use the trial as an animus meter to figure out who's got the most animus. We're not here to try to figure out is his hat slightly black, slightly more black than his hat. The issue is really if you look at in the appendix at A13, there's the chief conference of circuit judges, page three. At the bottom, it's got a half a page of findings. And this is the form that's approved. It's a five page order. It's approved by the conference of chief circuit judges to be used in these kind of no-stalking applications. And the findings general says in granting the following remedies, the court has considered all, and I emphasize all, relevant facts. Including but not limited to the nature, severity, and impact on the petitioner of respondents two or more acts of following, monitoring, observing, surveilling, threatening, communicating, or interfering or damaging property or the pets of the petitioner. That's all that's relevant. If you show two or more acts directed at the petitioners that would cause a reasonable person as the finder of the act to have emotional distress, which is defined as significant mental suffering, anxiety, or alarm, the order should issue. Everything else, unless it's one of the rare defenses that are defined, like if you're striking, strikers can't be held to be stalkers under the order. There's an exemption for that. But it shows that the legislature knew how to write exemptions, and they didn't put exemptions in for people's motives. One of the things about the no-stalking model law is they point out that sometimes stalkers love the person that they're going after, that they're stalking. And they don't want to scare them. They don't want to harm them. They love them. They think if I just contact this person enough, they'll see the light and start to love me back. But that's not the law. The motive is irrelevant. All right. So the point of all of that was it's improper for the trial judge to add defenses. And we've cited a Supreme Court case, People v. Santos, on a similar stalking act, 2-11, Illinois 2nd, 395, from 2004. I did want to highlight a few more facts. So I pointed out earlier that the Dribbins suffered all contact with the Davidsons in 2002, 11 years ago. And the testimony, the undisputed testimony in the record was that Mrs. Davidson was telling people that Dr. Dribbin was a murderer. And they didn't like that. They didn't like the drama that came about. Smithton's a small town. I don't know if your honors are from small towns, but small towns, everybody knows everything about everybody else. And having rumors spread about them being a murderer is unpleasant. So in 2002, the Dribbins changed their phone number. Well, that didn't work. She got the new phone number. So in 2006, they disconnected the phone line. Now, on April 7th of 2006, before any litigation between the Dribbins and the Davidsons occurred, the Dribbins had their attorney, Kirk Schrader, from Mathis, Moravian, send a letter telling Mrs. Davidson to cease and desist with further contact with the Dribbins. Now, under the Act, and that's exhibited at J in our binder, under the Act, from that moment forward, all other unwanted contacts, by definition, are stalking acts. And then the only issue is, is would a reasonable person feel emotional distress or fear caused by the act? And that's, if you look at 740 ILCS.1.10, under the definition of contact, that's where you'll find that. Okay, so on August 17th, the Dribbins filed suit against Mrs. Davidson and her husband, and also the Arises, the third party in the neighborhood. On August 18th of 2006, Kirk Schrader sent another letter, actually sent it to Mrs. Davidson's counsel, Tim Bates, asking Mr. Bates to have Mrs. Davidson stop contacting the Dribbins. On October 12th of 2006, Kirk Schrader sent Mr. Bates another letter asking Mrs. Davidson not to drive her home over the Dribbins' property on the dam, and not to farm their property. And so, there's been a lengthy history of these acts, and polite, reasonable requests simply go unignored. So, in 2011, the Dribbins obtained a number of preliminary injunctions. Preliminary injunctions to keep them from trespassing on their property. Preliminary injunctions to keep them from farming their property. Preliminary injunctions to keep them from basically doing anything that harasses them, including, you know, killing their grass and things of that nature. And all of these preliminary injunctions have not deterred the Davidsons from going down to the Dribbins' property, which is roughly, you know, from where their house sits. I actually have a demonstration of it. Their house, are you honestly familiar with the layout of this property? These are huge parcels. They're each 42 acres in size. And my client's property is the southernmost house right here. It sits on the lake. Mrs. Davidson's property is the house right there by 5B. It also sits by the lake. And in order for Mrs. Davidson to get into the Dribbins' property, what they need to do, Your Honors, she needs to drive down her driveway here, and then come all the way down here to where the property is. And then this is the area right in here where she's been killing the grass. Now, the Dribbins believed, up until 2007, that these six fir trees right here were the property line. Everyone treated them as the property line, including the Davidsons. And so Mrs. Davidson, for whatever reason, in 2007, had Meadowmire Engineering come out and put survey stakes right here in the Dribbins' backyard. And then they had a stake put here, and then they had a stake put up here by the lake. There's two lakes. There's a 23-acre lake here, and a smaller 10-acre lake that sits up a little bit higher than this lake. And so, this area in here where the triangle jars were, much of the testimony occurred. And the question becomes, why on earth would she suddenly feel the urge, after living there since 1995, why on earth in 2007 would she want to come down and start taking care of a little tiny parcel right there, which she previously, according to her own testimony, felt the Dribbins' own? Why would she do that? And why won't they just leave it alone after the Dribbins have asked them repeatedly to do that? It just doesn't make any sense. This area up in here, this is what has been referred to as the Dribbins' 50-foot strip. The Davidson's farmer, Gary Hiram, testified in his deposition that he farmed a property at Davidson's request. And he didn't do that after I had published it. And he handed them a preliminary injunction in his deposition saying he can't farm their property. He went out and farmed it again. So there's this ongoing, very frustrating sequence of events that have occurred that are really troublesome. Now, after the court, Judge McGlynn, on June 30th of 2011, entered a 90-day order, which we appeal to your honors, and you affirm Judge McGlynn saying what he did was reasonable, and I understand that. The order expired, and within a month, or a couple months, she was down there tilling the grass again. Now, the methodology of how she tilled the grass, whether she cut it really low or whether she sprayed it with chemicals, only she knows. We don't know. We just know that the grass turned really brown in a very straight line where she felt the property might turn. So, you know. So we tried to supplement the record in front of your honors with a motion. We filed the papers, the photographs with the circuit court, filed a motion to supplement it with that additional evidence into the record so that we could show that after the 90-day order expired, it was insufficient because she's down there tilling the grass again. And your honors denied the motion. I understand that. And Judge McGlynn was then, well, Mrs. Davidson's attorneys then filed a motion to sanction me and sanction my clients for filing the photographs in the record. And the basis of the motion for sanctions was that we lied to the court. And that when we put the photographs in the evidence, that we were lying about Mrs. Davidson committing a tort. Now, when I submitted the pleading, I said that it evidences further tortious behavior by Mrs. Davidson. I didn't specify what the tortious behavior was on purpose because it could be many tortious behaviors, including trespass. So when we got that motion, I now am faced with a motion to sanction me personally. I've never been sanctioned in my career. I've been practicing law for 20 years. I've never even had an order saying that my clients are sanctioned. I try to be very careful in how I practice law and do the right thing. This case has been an ethical nightmare. And much of it is caused by Mrs. Davidson's acts of accusing me of improper conduct on December 3rd, 2011, when I went out to photograph the property lines. There's extensive testimony over five hearings of exactly what happened. But in my opinion, the evidence shows that Mrs. Davidson thought, oh, there's Mr. Mattock and Mrs. Driven. I can put a conclusory affidavit in the record, and it's he said, she said. And there'll be no way that they can prove that I'm wrong. Well, what she failed to appreciate was I was taking photographs in the 40 minutes that I was there. And in that 40-minute or 30-minute time frame, I snapped roughly 89 or 90 photographs. So roughly two a minute. So you can tell exactly where I'm standing at any given moment based on the vantage point of the camera. And her initial story was she saw me kicking her boat. You know, why on earth would I walk 100 feet over the property line and kick her boat? It just makes no sense. So then she got her photographs, and she realized, oh, gosh, the time sequence doesn't show him by the boat when I first alleged that I was looking out there. Now, remember, from her house to where the boat is, this is in the record. This is her house 5D. I'm standing up here on the dam. Actually, this dam has a ridge on it that goes over like that. I think it's S6 in the record. It shows how I was trying to get the property pin on the dam lined up with the pole out here in the middle of the field so you could see exactly where the property was. And so that's what I'm doing. I'm crouched down a little bit, photographing these shots. And Mrs. Davidson claims that from her window over here in 5D, she's got a boat that sits roughly right here, that she saw me kicking her boat at a distance of about 850 feet. And she saw my camera in my hand. There's no way. There's no way at that distance. And her son testified, well, when I looked out the window to show you, you were about that big. I said, what the record was like about a quarter inch. Isn't that right? And he said, yes. So my point to Joe Goodwin was, she could not come in and commit perjury and accuse me of doing things like that and not have it be an act of stalking me. The only point of that was to get rid of me. He went out there on December 3rd. Her deposition was set for December 8th. And I get the Mike Williams letter on December 5th accusing me and my client of lewd and lascivious acts on Mrs. Davidson's property in the middle of the day. And he told me, you know, keep your big cloud feet off their property. And if you ever come back out here again, I'm going to have you arrested. So the only way that Mr. Williams would have known we were even out there is if Mrs. Davidson was telling him that. And if she told him that I did these things, that is committing a fraud on the court. It's not privilege. And when I tried to ask her questions about what happened and what did she tell Mr. Williams, Judge McGlynn sustained the attorney-client privilege objections. After Mrs. Davidson put it at issue by saying she had no involvement in Mr. Williams sending the December 5th letter. No involvement. So Mr. Williams either made everything up or he was there, which the Davidson said he wasn't, or Mrs. Davidson had some involvement. Now, the issue of why we were out there to begin with revolves around a white pole. And you can't really see it on here, but it's 25 feet north of this point here on the north side. In the white pole in the June 10th hearing, Mrs. Davidson testified with a form of property marker. So she then corrected herself and said, no, that's not the form of property marker, it's to hang no trespassing sign on it. So that left me... You're doing it again. Cancel. I'm sorry. No, I understand. Good morning, Your Honor. My name is Gary Meadows. I represent Geraldine Davidson and her husband, Gary Davidson. As Your Honors are probably well aware, Geraldine Davidson is primarily the target of this case. Although, clearly, any ruling in this case has great impact on her husband, too, because he's sort of caught up in the swirl of the ongoing dispute between these neighbors. But for these purposes of today, however, we're really talking about Mrs. Davidson. And let me just start out by saying, big picture, it's my belief this is not a stalking suit. It never has been a stalking suit. This is a... These stalking claims were conceived as a basis to try to leverage property issues that these neighboring landowners had. There are issues out there, and I'm not going to bore Your Honors with the details, but whether there's a walking easement around the lake, exactly where the property lines are. And as I'm sure Your Honors know, sometimes when neighbors start disagreeing about the way things should be, it tends... You can't really get away from them. You tend to have to... Things tend to escalate. People tend to get irritated with each other. And those of us who live in suburbs know that the closer the neighbor is, the more difficult it can be. But the bottom line is this was... What I think occurred in this case is that the counsel for the Griffiths identified this relatively new stalking act. Saw that it had to grade upside because it wanted to be used as leverage to try to get the property issues resolved in a way favorable to the way he wanted them to go. If an order were to be entered, it allows you to call the police on your neighbor any time they do something. And under the guise that it's somehow stalking, you have them arrested, which is a huge hammer. I mean, it basically makes a neighbor afraid to come out of their house with fear that anything they do may be viewed as being unlawful or stalking. And lastly, of course, in addition to the stalking case, there are any number of claims for emotional distress, all of which are still pending for the St. Clair County Circuit Court, where they're trying to get money for this. In addition to the fees that Mr. Mr. Mattick is asking with respect to the stalking. So there's a great outside. And the fact of the matter is it's no harm in taking a swing at least, I think, from the driven perspective. And one of the ways that I think that's illustrated is that when they file this action to begin with, the first thing they did was file a T.R.O., file a motion for T.R.O. And Judge McGlynn, as he was presented with a verified application, he granted their T.R.O. They wanted such things related to the property. I don't want you to farm your property. Now, if you've seen – if you're honest in seeing the picture, there is any number of acres that can be farmed and that Mrs. Davidson and Mr. Davidson had hired a farmer to allow the farmer to farm those. And I think – I don't – I'm not a farmer, but I understand that they get paid some amount of money based on what the farmer cultivates. Anyway, but basically, they go to Judge McGlynn. They get an order. You're not supposed to farm out there on these 40 acres. I want there's some signs off your deck that I don't like because we don't think they're funny. One of the signs is I remember – and there was a couple of them – one of the signs said trespassers will be prosecuted if not electrocuted. Now, she – obviously, Mrs. Davidson thought that was humorous. Your Honors may not. The fact is it's a silly thing, but it became the subject of a T.R.O. She had a fountain in the lake that basically she and her husband had put in there – had paid out and put in there off of the backside of their house to keep the water aerated, to keep the algae down. The T.R.O. – I want that fountain disconnected. We think it's unsafe. So all – I mean, this all started out that we want certain things about the property done differently, and that's what occurred. I mean, and then Judge McGlynn then spent the next month in hearings over these matters, listening to hours and hours of testimony. And in my estimation, I wasn't present at that hearing. I've been at this counsel since then. But Judge McGlynn was incredibly patient with all the parties because I think, frankly, there was rudeness going back and forth all the time. And I'm not sure there were that many judges down in St. Clair County that would have been as patient as Judge McGlynn was on this thing. Ultimately, Judge McGlynn was at all his testimony back then in 2011 and basically entered a 90-day no-contact order under his equitable authority. And my sense is he viewed this case as there's tension between these neighbors. You stay away. Hopefully, this will cool down and you guys can see the wisdom of resolving your issues and going on your way. And I think as the litigation continued, in the months after, he realized that wasn't happening. And I think he began to see it for what this was, that these stalking issues really were more of a platform to try to get other property issues resolved that in favor of the Drivens as against the Davises. Now, and that, of course, came up on appeal to your honors. And in the meantime, while that appeal was ongoing, there was a second stalking petition. And I call it the first stalking petition, and this is the second. And now there's actually a third in St. Clair County Circuit Court that is currently pending that has not been heard. And to add two or three more things on, they're saying Mrs. Davidson has done improperly. Anyway, the bottom line is that there was a second stalking petition, and it basically was Mrs. Davidson looked out her window on December 3rd and saw Mr. Manette and or Mrs. Driven trespassing on the property. And that irritated her. What did she do about it? Nothing. She got irritated, and frankly, she didn't run out. She didn't shoot at anybody. She didn't do anything. She simply got irritated and let it go. They also – and then they said another act of stalking was the fact that Mike Williams, the attorney for Gary and Jerry Davidson, wrote a letter to Paul, a very rude letter. No, there's admittedly a rude letter, but as Your Honor's made sense, as this case keeps growing whiskers on it, there's more and more tension builds up in it, frankly. And I think I've tried to be very cordial with Mr. Manette in terms of working issues, and I think we've successfully done that. But Mr. Williams and Mr. Manette get along like oil and finish them. They just don't. And so basically Mr. Williams sent a rude letter saying stay off the property. That's the second act of stalking then. And then he threw in also – and also you killed this grass on your property but near – on your legal property but near our house. And that was it, and that started a whole brand-new series of hearings. Ultimately, the judge heard probably 20 hours of hearings on this. Again, more patient than anybody had a right to expect. And ultimately concluded that not only with respect to everything that had been presented in the first hearing but also the second set of hearings that he – that what was being talked about was not stalking under the act. And secondly, even if you believe some of it, it wouldn't cause any reasonable person emotional distress. And in fact, the judge McGlynn – and I'm not going to – I can go into those specific findings, but for example, December 3rd he said looking at a window on December 3rd was not surveillance. Sending a rude letter was not stalking. Even if the grass was killed and she testified it wasn't and the judge later concluded it hadn't been killed, that would not have caused any person – reasonable person emotional distress. Ultimately, the judge basically denied the request for relief, I think because he sees, as I do, that this is really a lever to try to achieve a goal other than what is stated on there trying to keep her away. It's just not there. And frankly, if there was something there, he would be hearing about it, whether she's chasing them with weapons. If there was something out there, it would have been all over the front page. It's just not there. So they have to try to label everything that can stalking in order to try to file a motion to enjoin her in the hopes that if they get an order, they can then proceed to try to get money from her and to try to get the sheriff out there anytime she steps out of her back door. And one of the things that the judge noted, and I think this was really important, he found in his order that they were spiking the ball. And what he referenced by that is the day they received their TRO, that don't farm, take your signs down, disconnect the fountain. What they did is Mr. Driven, Mrs. Driven, and their youngest son got in their boat, came all the way around this roughly 10 acre lake, stopped behind the Davison's house 30 or 40 feet off of their deck about nine. I think it was late at night. It was in the dark and proceeded to stop there and stay there for a while, during which time they were taking photographs. So the bottom line is I think Judge McGlynn viewed that and basically said, look, these are not people that are scared for their safety. These are not people that are experiencing distress. These are people that are spiking the ball. They're trying to find a means by which to attain the goals they think they want to achieve. And the fact is, that's one of the reasons that he rejected their claims because they're contrived. They just aren't. And the issue before this court is Judge McGlynn's order against the manifest way of the evidence. That's the standard of review. It is not. He heard hours and hours and hours of testimony, judged everybody's credibility. In fact, he commented in sort of Mrs. Davison was effectively cross-examined, but he also commented Mrs. Driven was overly dramatic. And he is in the best position to judge what everybody's saying, whether everybody's over-dramatizing. And frankly, that's what's going on here. Everybody's over-dramatizing what to people who have no particular history would not be a big deal. But in this case, they tried to obviously make it a big deal. And so bottom line is it's not against the manifest way of the evidence. In this case, it should absolutely be affirmed. Judge McGlynn spent too much time and effort on this case. And I noticed in the briefing Ms. Dramatic basically said that Judge McGlynn was hostile to the act, which he never expressed any hostility to the act at all. He simply construed it the way he thought it was the most appropriate to construe. And two, I thought this was strange. In the last part of the briefing, Judge McGlynn was sexist. That is, that if it was a male-female issue, he probably would have granted it. There's nothing in the record, no indication that that's true at all. And, in fact, he was the epitome of professionalism. So bottom line is he dedicated far too much effort to let everybody have their say, and it should be affirmed. Now, the one argument that Mr. Maddox makes, the motive is irrelevant. He says under the statute, motive is irrelevant. And what's ironic about that is it's belied by the statutory language itself, which requires a specific intent directed at a specific person. That is, Mrs. Davidson was out to get Mrs. Driven because Mr. Driven really isn't part of this. He's sort of – just like Mr. Davidson really isn't part of this. It's really Mrs. Driven against Mrs. Davidson. And the bottom line is that the statute itself talks about being directed at a specific person, so it does require some sort of real intent to do something and to do something improper. And – but the irony of that is they went over – in their testimony, they actually – that Driven's actually put on a testimony of my client's motive. They said she had cancer, and so we think that she – because of that illness, she has nothing to lose by being reckless. And then they also commented that they were out to prove that she was a fraud because of other litigation that they're suing her on. And she's trying to protect her legacy. So they're putting that motive out there. Why are they doing that if it's not even part of the issue? It absolutely is part of the issue. Otherwise, frankly, to construe it as – to construe this statute as Mr. Maddox suggests is to allow somebody in a – the example I was thinking of this morning as I'm driving here is I drive to work the same way on 255 every day. I run into the same drivers every day because we all happen to go to work at the same time along the same way. If I'm there – if somebody happens to notice me following them two or three days a week down the highway, that happens, but you have to show intent that I'm actually trying to do something to them. You don't just get to create stalking that Mr. Maddox is back there. He's three times this week. He's following me. It has to be coupled with something real like the cases he talked about in his briefing where they were following and threats to kill. There's nothing like that in this case. This is two neighbors who obviously, for whatever reason, don't particularly get along. If there was anything substantial out there that they really could point to, they would have pointed to it. Judge McWhinney commented that if they had photos or anything of that – of Mrs. Davidson doing anything wrong, they'd be blown up on a picture board of this size. It's just not out there. And just as a final point, and Mr. Maddox may suggest that this – I'm somehow attacking – this is the defense is to attack the other side. It is not Mrs. Davidson who's doing any stalking. If any stalking is happening, if you look at his briefing, the things he says can constitute stalking, using the legal system against somebody. The Drivens have now sued Mrs. Davidson I think four times now in different cases. They haven't won anything yet, but they keep trying. And again, we're on our third stalking petition that I'm going to have to go back and deal with in front of the new judge, Judge Hayden. And so it just never ends. Using controlling behaviors is another factor. I would point back to the TRO. Take down your signs. Disconnect your fountain. Do the thing. Agree to the restrictive covenants that I think should be out there, not the ones that you want. I mean, it's all about controlling the way this little enclave of houses is supposed to operate. Using surveillance, Judge McWhinney clearly was not pleased when he learned about this, that the Drivens put a hidden camera on their property. But they faced it. They faced it toward the Davidson property. When he was asked why they did that, Mr. Manick explained that that was because their house had been broken into a time or two. But the house is facing this direction and the camera is facing the Davidson property. And so Judge McWhinney basically was not in favor of that explanation because to take a picture of the Davidson property doesn't do anything to protect your house. So basically Judge McWhinney expressed some serious dissatisfaction with that. And if anything, that's as close to stalking as anything, putting a hidden camera facing the property, facing my client's property, taking photos whenever anybody's down in that area. Bottom line is this is not a stalking case. This is a property dispute type case. And I hope that at some point in time those issues will all be resolved to mutual satisfaction in some way. But it's not a stalking case. And Judge McGlynn's findings are not against the manifest way of the evidence. And I think it would be a huge mistake to overturn something that he necessarily spent a great deal of time working on and spending literally 30 or 40 hours listening to these neighbors fight with each other. Well, you're calling them neighbors. Are they really neighbors? I thought the one pet party lived in St. Louis.  Ex-neighbors. Right. Ex-neighbors. Neighboring landlords. And they're just property owners. They still own that property back there. They're trying to sell it, I guess. Right. They're trying to sell it. But as I understand it, the Drivens come back to that property regularly. Has it been broken into? Pardon me? Has it been broken into? That's what Mr. Manning has reported. I don't really know. It's not in the record. I don't really know. It is in the record. Okay. I don't know that. And their kids and some of their friends show up late at night and party on the cove. It's a great place. They're meaning who? I don't know. Which part? I'm sorry. The Drivens. The Drivens have some grown-up children, 20 or something like that. And people will show up late at night, 10, 10, 12, 2 in the morning, park over there because it's a great hidden enclave for teenagers looking for a place to go that nobody's going to see them. And so it's still used pretty regularly, but I think nobody's permanently residing there. It's for sale. I thought I read in the record. It is. It is. It's been on sale on and off. And Judge McLean questioned whether or not they truly were trying to sell it because it was marked, I think, $200,000 above its market value. More than they paid for it? More than they paid for it. You don't buy it? So anyway, I appreciate your time, Your Honors. And frankly, the thought of mine is I'm obsessed that the Court affirm Judge McLean's order in its entirety. And hopefully we can try to put this, what he called the Davidson-driven border war, to rest at some point. Thank you. Thank you, Your Honor. We have a motion pending with the Court to strike the references from the last hearing after the Court entered its November 19, 2012, order. And you all haven't ruled on that yet? I think it was taken with the case. All right. So most of the things that he, Mr. Meadows, and by the way, I like Mr. Meadows a lot. He and I get along very well. I like Mr. Williams. I don't like what Mr. Williams does about me in court, but I've never done anything other than professional with Mr. Williams, and I think the record reflects that. Let's see. Your Honor brought up the fact that the Drivens moved. On September 30, 2009, Kurt Schrader wrote Tim Bates again and asked Mrs. Davidson not to contact Chase Driven, the Drivens' microphone, because Mrs. Davidson was contacting him through And then, of course, shortly after that, the Drivens moved to Missouri to get away from Mrs. Davidson. That fact is nowhere to be found in Judge McGlynn's order, which is a very important fact. If these people really were doing this all as a litigation pretense, why would they have moved two years before they filed a claim or a request for the order and a year before the act was even passed? People don't move away from someone, from a home on 42 acres that sits on a 23-acre lake. By the way, the A565,000 Ford is on the market now for $599,000, and I'm sure you can get it for a steal if you'd like it. And that's after they upgraded it with a pool and a greenhouse and hardwood floors and all that stuff. So they really do want to get out of this mess. The whole point of the act, though, is to get rid of issues of motive. In this case, like I said, it epitomizes delving into the realm of people's motives. It takes an enormous amount of energy to litigate those kinds of issues, and Mr. Meadows correctly said that the act requires specific intent. Now, he didn't explain what the act means by specific intent, but the act's specific intent is you intended to do the act. So it means that she intended to go down and cut the grass so low that it all dies, or she intended to go down and spray chemicals on the grass so it all dies. It doesn't mean that she intended to hurt the drivers. And the reason that the act is framed in that manner is because the law holds people responsible for their behavior. And it's too complicated to try to prove motive and intent and so forth. And the Illinois legislature said, you know what, we've had it with these stalking cases. The prosecutors are not getting convictions. The criminal act was amended to mirror this act, by the way. It's the exact same language. So, you know, the legislature recognized that these kinds of diversions into what people or whatever is not, it's not conducive to the goal of allowing people to be left alone if they want to be left alone. Now, Mr. Meadows says that, well, gosh, you know, if you give us this order, that will then allow us to leverage that against all the property issues. I don't see that connection at all. I mean, she can, Mrs. Davidson, the Davidsons can agree to another restrictions or not. Whether you grant an order or not, she can be, you know, she can live in her house. She's fine. She can keep the property rights the way they are. It's not going to give them any leverage at all. The Drivens have never done anything other than try to get relief when Mrs. Davidson tags them. So, you know, in our brief on page 11, we put this photograph of Mrs. Davidson, okay. I don't know if Your Honors noticed that or not, but that's the same photograph Mrs. Davidson attached to her brief moving to strike the petition for a no-stalking order where she cut herself out of the photograph while she was submitting an affidavit telling the court she's afraid of the Drivens and she never goes down by the property because she's scared of them. Okay. Now, the Drivens do come in and maintain the property. They have to do that. If they want to have any reasonable chance of selling it, they have to keep it up. The house was broken into. I'm glad you brought that point up. Mrs. Davidson somehow knew that the police had been called. She called the sheriff's cell phone number and told the sheriff this is all voluntarily by her. And we have this exhibit. Thank you, Your Honors. Okay. Thank you, Payles.